**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

<table>
<tr><td>
TRISTAR PRODUCTS, INC.,

     Plaintiff,

         v.

E. MISHAN & SONS, INC.,

     Defendant.
</td><td>
Civil No. 17-1204 (RMB/JS)

**OPINION**
</td></tr>
</table>

Appearances

Edward P. Bakos, Esq.
Bakos & Kritzer
147 Columbia Turnpike
Florham Park, New Jersey 07932
    *Attorney for Plaintiff Tristar Products, Inc.*

Dennis F. Gleason, Esq.
Jardim, Meisner & Susser, P.C.
30B Vreeland Road, Suite 201
Florham Park, New Jersey 07932

Angelo Notaro, Esq.
John Zaccaria, Esq.
Peter Bucci, Esq.
Notaro, Michalos & Zaccaria P.C.
100 Dutch Hill Road, Suite 240
Orangeburg, New York 10962
    *Attorneys for Defendant E. Mishan & Sons, Inc.*

**BUMB**, United States District Judge:

This matter comes before the Court upon the Motion for a

Preliminary Injunction filed by Plaintiff Tristar Products, Inc.

("Tristar" or the "Plaintiff"), seeking to enjoin Defendant

E. Mishan & Sons, Inc. ("Emson" or the "Defendant") from selling

its Gotham Steel deep square pan [Docket No. 5].  On April 11,
2017, this Court held a hearing on Plaintiff's motion.  For the
reasons set forth below, Plaintiff's motion is DENIED.

## I.  BACKGROUND

As alleged in the Complaint,[1] on February 7, 2017,
U.S. Patent No. D778,103 (the "'103 Patent"), entitled "Pan",
issued to Keith Mirchandani and Mo-Tsan Tsai.  The '103 Patent
was assigned to Tristar Products and KE M.O. House Co., Ltd. by
Mo-Tsan Tsai on May 23, 2016 and by Keith Mirchandani June 20,
2016, and duly recorded with the United States Patent and
Trademark Office ("USPTO").

On February 14, 2017, U.S. Patent No. D778,664 (the
"'664 Patent"), entitled "Pan", issued to Keith Mirchandani and
Mo-Tsan Tsai.  The '664 Patent was assigned to Tristar and
KE M.O. House Co., Ltd. by Mo-Tsan Tsai on May 23, 2016 and by
Keith Mirchandani on June 20, 2016, and duly recorded with the
USPTO.  The '664 Patent and '103 Patent are collectively
referred to as the "Patents".

The Patents protect the design of a pan for use in cooking.
Tristar utilizes the patented designs in its successful Copper
Chef square pan.  According to Tristar, the Copper Chef pan has

---

[1] On the day of the hearing, Tristar filed an Amended
Complaint alleging infringement of an additional patent which is
not the subject of the within hearing.

been the subject of extensive promotion and has attained immense success in the marketplace.

On February 21, 2017, Tristar filed the within lawsuit and filed a motion for a temporary restraining order and a preliminary injunction, preliminarily enjoining Emson from marketing or selling its Gotham Steel pan. Generally, Tristar alleges that, to the ordinary observer, the Gotham Steel square pan appears substantially and confusingly similar to Tristar's Copper Chef product and patented design. In addition, Tristar alleges that Emson's Gotham Steel square pan infringes Tristar's Copper Chef trade dress, including the shape and depth of the pan as well as the pan's retail packaging.

## II.  **ANALYSIS**

"[T]he standard for granting or denying a motion for a preliminary injunction is not unique to patent law, and . . . the standard of the regional circuit should apply." Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1367 (Fed. Cir. 2008). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips

in his favor, and that an injunction is in the public interest."
Id. at 20 (internal citations omitted); see also AstraZeneca LP
v. Apotex, Inc., 633 F.3d 1042, 1050 (Fed. Cir. 2010); Titan
Tire Corp. v. Case New Holland, Inc., 566 F.3d 1372, 1375-76
(Fed. Cir. 2009); Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700,
708 (3d Cir. 2004).  The Court addresses these factors in turn.

### A. LIKELIHOOD OF SUCCESS ON THE MERITS

#### i. Patent Infringement Claims

In order to demonstrate a likelihood of success on the
merits of its patent infringement claims, Tristar must show
that, "in light of the presumptions and burdens that will inhere
at trial on the merits, (1) [Tristar] will likely prove that
[Emson] infringes its [Patents], and (2) [Tristar's]
infringement claim will likely withstand [Emson's] challenges to
the validity and enforceability of the [ ] patent[s]."
AstraZeneca LP v. Apotex, Inc., 623 F. Supp. 2d 579, 587 (D.N.J.
2009) (quoting Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239
F.3d 1343, 1350 (Fed. Cir. 2001)); accord Oakley, Inc. v.
Sunglass Hut Int'l, 316 F.3d 1331, 1340 (Fed. Cir. 2003).

Stated differently, Tristar, as the patentee, "must
demonstrate that it will likely prove infringement of one or
more claims of the patents-in-suit, and that at least one of
those same allegedly infringed claims will also likely withstand
the validity challenges presented by the accused infringer."

Amazon.com, 239 F.3d at 1351.  If Emson, the alleged infringer,
raises a substantial question as to infringement or validity,
i.e., "the alleged infringer asserts an infringement or
invalidity defense that the patentee has not shown lacks
substantial merit," then the Court should not issue the
preliminary injunction.  AstraZeneca LP, 633 F.3d at 1050
(citing Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1364
(Fed. Cir. 1997)).

Tristar alleges that Emson will infringe the Patents by
marketing and selling its Gotham Steel product.  Gotham Steel
argues that it does not infringe the Patents and, in any event,
the Patents are invalid as either anticipated or obvious.

### 1. Infringement

The '664 Patent claims the design for a pan, as shown
below:





FIG.5

FIG.6

FIG.7

FIG.8

FIG.9

'664 Patent [Docket No. 1-2].

 The '664 Patent also indicates that the "elements depicted in broken lines in the various figures are included for environmental purposes only, and form no part of the claimed design." '664 Patent, p. 1.

The '103 Patent claims the design for a pan, including the pan's bottom, as shown below:



'103 Patent [Docket No. 1-3].

Like the '664 Patent, the '103 Patent indicates that the "elements depicted in broken lines in the various figures are included for environmental purposes only, and form no part of the claimed design." '103 Patent, p. 1.

A design patent is infringed if it embodies the patented design or "any colorable imitation thereof." Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665, 678 (Fed. Cir. 2008) (en banc). The test for design patent infringement is whether the two designs appear "substantially the same" to the "ordinary observer." Id.

Tristar contends that the designs of the Patents and the Gotham Steel pan are nearly identical. To illustrate the point, Plaintiff introduces the following side-by-side comparisons of the patented designs and the Gotham Steel pan:





'103 Patent, Figs. 1, 4, 6; Gotham Steel pan. Pl. Br. at 7 [Docket No. 5-1].



Pl. Br. at 2.





'664 Patent, Figs. 1, 4, 6; Gotham Steel pan.  Pl. Br. at 7-8.

| Design of '664 Patent | Defendant's "Gotham Steel Square Pan" Product |
|:---:|:---:|
|  |  |
|  |  |

Pl. Br. at 1. Tellingly, however, Tristar does not include a side-by-side comparison of the bottoms of the '664 Patent pan and the Gotham Steel pan.

Emson responds that it does not infringe either the '664 Patent or the '103 Patent. First, as Emson correctly points out, the '664 Patent depicts a pan with a plain bottom. The Gotham Steel product, on the other hand, clearly has an induction plate on its bottom. Second, with respect to the '103 Patent, the patented design shows an induction plate on the bottom of the pan with a plain circle in the center, surrounded by six rows of small circles, totaling 234, and the circles are not diagonally aligned. In contrast, the Gotham Steel product has no plain center circle, and instead has eight rows of small circles, totaling 217, which are diagonally aligned.

A proper design patent infringement analysis requires that all of the ornamental features illustrated in the figures be considered. Contessa Food Prod., Inc. v. Conagra, Inc., 282 F.3d 1370, 1378, 1381 (Fed. Cir. 2002) abrogated on other grounds by Egyptian Goddess, 543 F.3d 665. Emson has correctly pointed out all of the differences between its product and the figures in both Patents. Clearly, an ordinary observer would not view the design of the Gotham Steel product to be the same or a colorable imitation of the patented designs. As such, Plaintiff has failed to show a likelihood of success on its infringement claims.

Even assuming Tristar had made such a showing with respect to infringement, Emson contends that the Patents are invalid because they are either anticipated or obvious. Accordingly, the Court next considers the validity of the '664 Patent and the '103 Patent.

## 2. Validity

Under 35 U.S.C. § 282, "'a patent is presumed valid, and this presumption exists at every stage of the litigation.'" Sanofi-Synthelabo v. Apotex, 470 F.3d 1368, 1375 (Fed. Cir. 2006) (quoting Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc., 134 F.3d 1085, 1088 (Fed. Cir. 1998)). This presumption, however, is not a substantive rule, but rather a procedural device that serves to assign the burden of proof during

litigation.  <u>D.L. Auld Co. v. Chroma Graphics Corp.</u>, 714 F.2d 1144, 1147 n. 2 (Fed. Cir. 1983).  As Section 282 makes clear, "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."  35 U.S.C. § 282(a).  Notwithstanding, "[i]n resisting a preliminary injunction, . . . one need not make out a case of actual invalidity.  <u>Vulnerability</u> is the issue at the preliminary injunction stage, while validity is the issue at trial."  <u>Amazon.com</u>, 239 F.3d at 1359 (emphasis added).  "In other words, a defendant need not prove actual invalidity [at the preliminary injunction stage].  On the contrary, a defendant must put forth a substantial question of invalidity to show that the claims at issue are vulnerable."  <u>Erico Int'l Corp. v. Vutec Corp.</u>, 516 F.3d 1350, 1356 (Fed. Cir. 2008).  Significantly, "a showing of a substantial question of invalidity requires less proof than the clear and convincing evidence standard to show actual invalidity."  <u>Id.</u> (citing <u>Amazon.com</u>, 239 F.3d at 1358).

### a. *Anticipation*

Design patent anticipation "requires a showing that a single prior art reference is 'identical in all material respects' to the claimed invention."  <u>Door-Master Corp. v. Yorktowne, Inc.</u>, 256 F.3d 1308, 1312 (Fed. Cir. 2001) (quoting <u>Hupp v. Siroflex of Am., Inc.</u>, 122 F.3d 1456, 1461 (Fed. Cir. 1997)).  In other words, the two designs must be substantially

12

the same.  See id. at 1313 (applying design patent infringement

test set forth in Gorham Mfg. Co. v. White, 81 U.S. 511, 528

(1871), as the test for anticipation).  "Two designs are

substantially the same if their resemblance is deceptive to the

extent that it would induce an ordinary observer, giving such

attention as a purchaser usually gives, to purchase an article

having one design supposing it to be the other."  Id. at 1313-14

(citing Gorham, 81 U.S. at 528).

Emson contends that the '664 Patent is invalid as

anticipated by Chinese Design Patent 303401337 ("CN '337"),

which issued on October 7, 2015 and was not considered by the

USPTO in the prosecution of the '664 Patent.  Specifically,

Emson argues that CN '337 contains four views that correspond to

Figures 3, 4, 6, and 7 of the '664 Patent as shown by the

following comparisons:



Fig. 3, D'664                    CN'337

Fig. 4, D'664                    CN'337



Fig. 6, D'664 (Top)

CN'337
(Rotated 90° degrees)

Fig. 7, D'664 (Bottom)

CN'337
(Rotated 90° degrees)

Def. Opp. Br. at 17-19 [Docket No. 19].

Tristar counters that CN '337 does not anticipate because the corners are substantially different and the design is more "chunky." This Court disagrees. When viewed from the sides, the sides of the CN '337 pan extend upwardly and outwardly at a small angle relative to its bottom, as do the sides of the pan disclosed in the '664 Patent. In addition, the lower corners of

both designs are rounded.  Indeed, the Court has superimposed
Figure 6 of the '664 Patent on to the image of the CN '337
design and confirmed that the corners are rounded in
substantially the same shape, although the Court recognizes
there are slight variations.  The ratio of the width to the
height of the CN '337 pan appears to be the same or
substantially the same as the width-to-height ratio shown in
Figures 3 and 4 of the '664 Patent.  While the dark figures in
CN '337 make it difficult to assess the similarities identified
by Emson from the top, the Court nonetheless finds that the
elements depicted in CN '337 are substantially identical to the
design in the '664 Patent and that any minor variations are
insufficient to change the overall effect.  Finally, the Court
does not agree that CN '337 presents a "chunky" design
contrasted with '664 Patent's sleek design.  The figures at
page 3 of CN '337, without the lid, also depict a sleek design.
As the design in CN '337 and the design of the '664 Patent
appear to be substantially the same with, at most, minor
variations, the Court finds that Defendant has raised a
substantial question as to whether the '664 Patent is invalid as
anticipated.

### b. *Obviousness*

Emson next argues that both the '664 Patent and the '103
Patent are invalid as obvious in light of the prior art.  Under

Section 103(a), a "patent may not be obtained if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). In assessing the obviousness of a patented invention, the Court should consider (1) the scope and content of the prior art; (2) the level of ordinary skill in the pertinent art; (3) the differences between the prior art and the claims at issue; and (4) such secondary considerations as commercial success, long felt but unsolved need, and the failure of others. Sciele Pharma Inc. v. Lupin Ltd., 684 F.3d 1253, 1259 (Fed. Cir. 2012) (citing Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966)); see also KSR Int'l Co. v. Teleflex, Inc., 550 U.S. 398, 406 (2007).

As to the '664 Patent, Emson cites several prior art references that it contends render it invalid as obvious. The Court addresses each in turn. First, Emson cites to the January 2015 Frieling USA, Inc. Catalog which displays a Woll square casserole pan, item W1024NL:



Def. Opp. Br. at 21.

16

Emson contends that the Woll W1024NL product is a 4-inch high, 9.5″ x 9.5″ square pan with two handles. The body of the Woll W1024NL pan has a shape identical in all material respects to the body shape of the '664 Patent's design, except for a lip that extends around the outside of the upper edge. The sides of the Woll W1024NL pan, like the sides of the '664 Patent's design, extend upwardly and outwardly, at a small angle, relative to the bottom of the pan. The corners of the bottom of the Woll W1024NL pan are rounded in substantially the same way as in the '664 Patent. Additionally, the size, shape, and depth appear the same. As noted, however, the Woll W1024NL pan has a slight outer lip along outside the periphery of the top edge of the pan.

Second, Emson relies upon the 2012 AMT Catalog that discloses several square pans: E269 and E269GS. Emson contends that items E269 and E269GS each comprise a square pan body having dimensions of 26 x 26 cm and a height of 9 cm. The body of both the E269 and E269GS pans has a shape identical in all material respects to the pan shown in the '664 Patent. The sides of the pans extend upwardly and outwardly, at a small angle, relative to the pan's bottom, as do the sides of the pan in the '664 Patent. Likewise, the corners of the bottoms of the E269 and E269GS pans are rounded as in the '664 Patent's design.

A comparison of the E269GS pan, as disclosed in the AMT Catalog, with Figure 1 of the '664 Patent follows:



E269GS          D'664 (Fig. 1)

Def. Opp. Br. at 22.

The aspect ratio of the E269 and E269GS pans appear to be substantially the same as the aspect ratio shown in the Figures of the '664 Patent. The size, shape, and depth of the E269 and E269GS pans and pan set forth in the '664 Patent are substantially the same, except for an outer lip that extends along the periphery of the upper edge of the E269 and E269GS pans. In addition, item E267GS in the AMT Catalog is substantially similar to item E269GS except that its height is 7 cm instead of 9 cm, demonstrating that variations in height of the pan body are within the prior art known to ordinary designers of pans.

Third, Emson relies upon Registered Community Design No. 000368949-0001 ("RCD '949"), which was registered on July 8, 2005. The pan design disclosed in RCD '949 has a square body and rounded edges, which are substantially the same as the

design depicted in the '664 Patent, as seen in the following
images from RCD '949:



0001.1

0001.2

RCD '949, Def. Ex. D [Docket No. 19-4].

The RCD '949 design looks the same as the '664 Patent's
design in all material respects, except for a lip that extends
around the periphery of the upper edge.

Fourth, Emson cites Chinese Design Patent 301766853
("CN '853"), which was published on December 21, 2011, and
discloses a square pot.  Emson argues that the pot disclosed in
CN '853, shown below, also has a square body, rounded edges, and
sides that slightly extend outward, which create an overall
appearance that is substantially the same as the design
disclosed in the '664 Patent.



Certified Translation of CN '853, Def. Ex. U [Docket No. 19-7].

Emson argues that the design characteristics of the foregoing references, which Emson refers to as the primary prior art references, create the same visual impression as the '664 Patent's design. The Court agrees. To an ordinary observer of pans, the designs present the same visual impression as the embodiment of Figures 1 through 7 of the '664 Patent and, as a whole, create a design that has the same overall visual effect as that claimed by the '664 Patent.

Emson also cites two secondary prior art references, Chinese Design Patent 301060141 ("CN '141") and Registered Community Design 001994369-0032 ("RCD '369"). CN '141 and RCD '369 each teach a pan with a lipless, straight edge along the top of the sides of the pan. CN '141 discloses a square pan with a lipless straight upper edge, as well as lower rounded corners and a width-to-height ratio similar to that of the '664 Patent's design.



Def. Opp. Br. at 24-25. Similarly, RCD '369 discloses a square pan with rounded corners and a lipless straight upper edge.



Def. Opp. Br. at 25.

The Court agrees with Defendant that CN '141 and RCD '369 both suggest to a designer of ordinary skill in the art of pan design that any one of the primary references, i.e. the Woll W1024NL pan, the AMT E269GS, E269, or E267 pans, the RCD '949 pan, or the CN '853 pan, may be modified by substituting a lipless straight edge to create a design that presents the same visual impression as the embodiments of the '664 Patent's design.

The Court now turns to the '103 Patent. Emson also argues that the '103 Patent is invalid as obvious because of the same prior art discussed above. Specifically, the Woll W1024NL pan, the AMT Catalog E269 and E269GS pans, RCD '949, and CN '853 have design characteristics that are substantially identical to the design disclosed in the '103 Patent. In addition, Emson points to U.S. Design Patent D594271 ("D'271"), which issued on June 16, 2009 and includes a bottom with a central planar circle, surrounded by a series of six concentric, circumferential-spaced circles, all encircled by an outer ring or rings. Emson also identifies U.S. Design Patent D696060 ("D'060"), which issued on December 24, 2013. The bottom of the pan disclosed in D'060 includes a center disc, seven circumferential rows of circles, and two concentric outer rings.

The Court agrees that a comparison of Figure 7 of D'271 and Figure 6 of D'060 demonstrates that these designs have the same overall visual appearance as the '103 Patent's design.



D'271 (Fig. 7)      D'103 (Fig. 7)      D'060 (Fig. 6)
(Prior Art)      (Tristar)      (Prior Art)

Def. Opp. Br. at 28.

It would have been obvious to an ordinary designer of pans to modify any one of the primary reference pans, i.e., the Woll W1024NL pan, the AMT E269GS or E269, the RCD '949 pan, or the CN '853 pan, by using the bottom disclosed in either D'060 or D'271 to create a design that has the same overall visual appearance as the '103 Patent's design. Again, although these references have a slight lip at top, the Court agrees with Defendant that, in light of CN '141 or RCD '369, it would have been obvious to an ordinary designer of pans to substitute a lipless, straight edge as these patents teach.

For the reasons set forth above, the Court finds that Defendant has raised at least a substantial question as to the

validity of both the '664 and the '103 Patents.  Additionally,
even assuming the Patents are valid, Plaintiff has not
demonstrated a likelihood of infringement of the Patents.
Accordingly, Plaintiff has not established a likelihood of
success on the merits of its patent infringement claims.

### ii. **Trade Dress Infringement Claims**

Section 43(a) of the "The Lanham Act, 15 U.S.C. § 1125(a),
establishes a cause of action for trade dress infringement."
McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d
350, 357 (3d Cir. 2007) (citing TrafFix Devices, Inc. v. Mktg.
Displays, Inc., 522 U.S. 23, 28-29 (2001)).[2]  "'Trade dress'
refers to the design or packaging of a product which serves to
identify the product's source."  Id. (quoting Shire US Inc. v.
Barr Labs., Inc., 329 F.3d 348, 353 (3d Cir. 2003)).  Trade
dress covers "the total image or overall appearance of a
product, and includes, but is not limited to, such features as
size, shape, color or color combinations, texture, graphics, or
even a particular sales technique."  Id. (quoting Rose Art

---

[2] "The federal law of unfair competition under § 43(a) is
not significantly different from the New Jersey law of unfair
competition."  Am. Greetings Corp. v. Dan-Dee Imports, Inc., 807
F.2d 1136, 1141 (3d Cir. 1986); accord Versa Prod. Co. v. Bifold
Co. (Mfg.), 50 F.3d 189, 216 n. 19 (3d Cir. 1995) ("New Jersey's
common law and statutory prohibitions of unfair competition
. . . generally parallel the federal cause of action for unfair
competition under section 43(a) of the Lanham Act.").
Accordingly, the Court addresses Plaintiff's trade dress claims
under the Lanham Act and New Jersey law jointly.

Indus., Inc. v. Swanson, 235 F.3d 165, 171 (3d Cir. 2000)).

"The purpose of trade dress protection is to 'secure the owner of the trade dress the goodwill of his business and to protect the ability of consumers to distinguish among competing producers.'" Id. (quoting Shire, 329 F.3d at 353).

To establish likelihood of success on the merits of its trade dress claims, Plaintiff must demonstrate the following elements:

(1) the allegedly infringing design is non-functional;

(2) the design is inherently distinctive or has acquired secondary meaning; and

(3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product.

Id. (citing Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 210-11 (2000)).

"In addition to satisfying these three elements, it is the plaintiff's duty to 'articulat[e] the specific elements which comprise its distinct dress.'" Fair Wind Sailing, Inc. v. Dempster, 764 F.3d 303, 309 (3d Cir. 2014) (quoting Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 381 (2d Cir. 1997); citing 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 8:3 (4th ed. 2014) ("[T]he discrete elements which make up the [trade dress claim] should be separated out and identified in a list.")). Accordingly, "[e]ven before it reaches the question of protectability, . . .

a district court should scrutinize a plaintiff's description of its trade dress to ensure itself that the plaintiff seeks protection of visual elements of its business." Id.

As a preliminary matter, the Court finds that Plaintiff has not established a likelihood of success on the merits of its trade dress claims as it has not adequately articulated the specific elements which comprise its trade dress. In its opening brief, Plaintiff claims that its trade dress "includes the size, shape and depth of the square pans (as shown above) sold under the Copper Chef trademark. The trade dress further includes the design and features as depicted on the packaging of the retail box." Pl. Br. at 2. Plaintiff does not, however, articulate any of these specific elements as comprising Tristar's distinct trade dress in its Complaint. Instead, the Complaint merely includes images of the Copper Chef pan and baldly states that "[a]ll the features that make up the COPPER CHEF trade dress are nonfunctional . . . ." Comp. ¶ 11 [Docket No. 1]. Moreover, the Complaint did not identify Copper Chef's retail packaging as comprising part of Plaintiff's protected trade dress. As currently pled, Plaintiff's allegations do not adequately "articulate the specific elements which comprise its distinct dress." See Fair Wind, 764 F.3d at 309 (dismissing trade dress claim because plaintiff "failed to give Defendants adequate notice of what overall look it wishes to protect.").

Even assuming that Plaintiff's articulation of the elements of its alleged trade dress in its briefing and during the motion hearing were sufficient, the Court finds that Plaintiff cannot establish a likelihood of success on the merits of its trade dress claims, for the reasons set forth below.

### 1. Inherent Distinctiveness or Secondary Meaning

To succeed on a trade dress infringement claim, a plaintiff must establish that its design is non-functional and that such non-functional design is "inherently distinctive or has acquired secondary meaning." McNeil, 511 F.3d at 357.[3] "Courts have held that a mark can be distinctive in one of two ways. First, a mark is inherently distinctive if '[its] intrinsic nature serves to identify a particular source.'" Wal-Mart Stores, 529 U.S. at 210 (quoting Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992)). "Second, a mark has acquired distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'" Id.

---

[3] As Defendant apparently does not dispute at this juncture that Plaintiff's trade dress is non-functional, for purposes of this preliminary injunction motion, the Court assumes, without making any findings, that Plaintiff has established the first element of its trade dress claims.

at 211 (quoting _Inwood Labs., Inc. v. Ives Labs., Inc._, 456 U.S. 844, 851 n. 11 (1982)).

Additionally, the Supreme Court has distinguished between two types of trade dress: product design and product packaging. _Id._ at 212. In _Wal-Mart Stores_, the Supreme Court explained that "[i]n the case of product design, . . . we think consumer predisposition to equate the feature with the source does not exist" as "[c]onsumers are aware of the reality that, almost invariably, even the most unusual of product designs--such as a cocktail shaker shaped like a penguin--is intended not to identify the source, but to render the product itself more useful or more appealing." _Id._ at 213. The Supreme Court further explained:

> The fact that product design almost invariably serves purposes other than source identification not only renders inherent distinctiveness problematic; it also renders application of an inherent-distinctiveness principle more harmful to other consumer interests. Consumers should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves by a rule of law that facilitates plausible threats of suit against new entrants based upon alleged inherent distinctiveness.

_Id._ Based upon this reasoning, the Supreme Court held that, "in an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a product's design is distinctive, and therefore protectable, only upon a showing of secondary meaning." _Id._ at 216.

As the Court noted above, a product's trade dress has acquired secondary meaning when "in the minds of the public, the primary significance of the [trade dress] is to identify the source of the product rather than the product itself." Id. at 211. "[A] design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods." TrafFix, 532 U.S. at 28. Secondary meaning may be established, for example, "through extensive advertising which creates in the minds of consumers an association between the mark and the provider of the services advertised under the mark." Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3d Cir. 2000).

To guide courts in determining whether trade dress has secondary meaning, the Third Circuit has set forth the following list of non-exclusive factors:

    (1) the extent of sales and advertising leading to buyer association;

    (2) length of use;

    (3) exclusivity of use;

    (4) the fact of copying;

    (5) customer surveys;

    (6) customer testimony;

    (7) the use of the mark in trade journals;

(8) the size of the company;

(9) the number of sales;

(10) the number of customers; and

(11) actual confusion.

E.T. Browne Drug Co. v. Cococare Prod., Inc., 538 F.3d 185, 199

(3d Cir. 2008) (citing Commerce Nat. Ins., 214 F.3d at 438).

Plaintiff contends that both its product design and product packaging comprise protectable trade dress.  At the preliminary injunction hearing, Plaintiff identified the elements of its trade dress as including the sleek aesthetic design of the Copper Chef pan, its rectangular shape, its depth, which Plaintiff claims is not normally associated with pans, and the location and shape of its rivets.  Plaintiff also claims that aspects of the Copper Chef pan's packaging constitute trade dress, including the inset images on the box.  Plaintiff's counsel noted at the hearing, however, that Plaintiff was most concerned with the trade dress of the actual product, rather than its packaging.  Accordingly, to establish a likelihood of success on the merits of its trade dress infringement claims, Plaintiff must, among other things, demonstrate that the Copper Chef product design has acquired secondary meaning and that its packaging design is at least inherently distinctive.

Plaintiff argues that it has invested over $40 million in advertising for the Copper Chef pan in the United States and

that its sales of the Copper Chef pan were over $100 million in 2016. Mirchandani Decl. ¶ 4 [Docket No. 5-2]; Mirchandani Supp. Decl. ¶ 5 [Docket No. 22-1]. Yet, Defendant has correctly pointed out that "there is no evidence before this Court as to what type of consumer recognition, if any, has resulted" from Plaintiff's investment in advertising. Def. Opp. Br. at 6 (citing EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp., 2006 WL 892718, at *7 (D.N.J. Apr. 4, 2006) (finding that "there has been no showing that those expenditures ($5.5 million in advertising) created actual consumer recognition of Plaintiff's marks. Without such proofs, the dollar amount of Plaintiff's advertising expenditures is not necessarily probative of the strength of its marks."). There is no evidence whatsoever in the record as to what Plaintiff's $40 million investment in advertising entailed or whether the advertising focused on Plaintiff's claimed trade dress, such that it resulted in buyer recognition. At this juncture, this factor does not weigh in favor of a finding of secondary meaning.

The Court next considers the length of use. It is unclear how long Plaintiff's Copper Chef pan has been on the market. In his Declaration, Keith Mirchandani, CEO of Tristar, stated that the Copper Chef pan "launched in the United States in 2016" and that "Tristar secured the rights to the Copper Chef square pan via assignment from the inventors of the pan on June 20, 2016."

Mirchandani Decl. ¶¶ 3-4.  In his Supplemental Declaration, however, Mirchandani avers that Plaintiff "began marketing and selling the Copper Chef square pan on November 14, 2015." Mirchandani Supp. Decl. ¶ 4.  Defendant began advertising the Gotham Steel pan in August 2016.  Mishan Decl. ¶ 8 [Docket No. 19-1].  Even assuming Plaintiff's product launched in November 2015, the length of use is relatively limited, especially in light of the fact that Defendant's product entered the market at most only nine months later.  Indeed, the duration of Plaintiff's use coincides in large part with the length of Defendant's use.  This factor indicates that Plaintiff's trade dress has not acquired secondary meaning.

Turning to exclusivity of use, as Defendant notes, Plaintiff acknowledges that the Copper Chef pan is frequently copied, resulting in non-exclusive use.  See Mirchandani Decl. ¶ 5.  At the preliminary injunction hearing, Plaintiff reiterated that it presently shares the square pan market with several competitors.  Additionally, as noted above, Defendant's Gotham Steel pan entered the market only months after Plaintiff's Copper Chef pan launched.  As Plaintiff's use has not been exclusive, this factor also militates against a finding of secondary meaning.  Moreover, as to the fourth factor, the fact of copying, there is no evidence in the record that Defendant intentionally copied Plaintiff's trade dress.

It is a glaring omission that Plaintiff has presented <u>no</u> evidence of customer surveys or customer testimony to support a finding of secondary meaning. Additionally, there is no evidence of the use of Plaintiff's trade dress in trade journals. Likewise, there is no evidence in the record of actual confusion. As to the number of sales, Plaintiff's CEO stated that "Tristar's Copper Chef pans were the number one selling product in 2016 for Tristar with sales in excess of $100 million. Tristar expects this trend to continue in 2017 with sales in excess of $150 million." Mirchandani Supp. Decl. ¶ 5. There is no evidence in the record, however, regarding the size of the company or the number of customers for Plaintiff's Copper Chef pan.

Having considered each of these factors, the Court finds that the record before it does not support a finding that Plaintiff's Copper Chef product design trade dress has acquired secondary meaning.

The Court next turns to Plaintiff's purported packaging trade dress. Plaintiff has not identified what it believes is inherently distinctive about its retail packaging. More to the point, Plaintiff has not established that any features of its retail packaging are inherently distinctive or that any such features have acquired secondary meaning. Indeed, Plaintiff's opening brief merely avers that "[e]ven the packaging of the

Gotham Steel Square Pan mirrors the Copper Chef trade dress" and includes the following side-by-side comparison of the retail packaging, with no further elaboration:



Pl. Br. at 11. This is wholly insufficient to establish that Plaintiff's retail packaging is inherently distinctive, let alone that it has acquired secondary meaning, or that Defendant's retail packaging infringes Plaintiff's trade dress.

For the foregoing reasons, the Court finds that Plaintiff has not adequately demonstrated that its trade dress is inherently distinctive or has acquired secondary meaning. As a result, Plaintiff has not established that it is likely to succeed on the merits of its trade dress claims.

### 2. Likelihood of Consumer Confusion

Finally, for the following reasons, the Court finds that Plaintiff has not established likelihood of consumer confusion and, therefore, cannot establish that it is likely to succeed on the merits of its trade dress claims. "A likelihood of

confusion exists when consumers viewing the defendant's trade dress probably would assume that the product it represents is associated with the source of a different product identified by the plaintiff's similar trade dress." McNeil, 511 F.3d at 357 (citing A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 211 (3d Cir. 2000)). Put differently, "a plaintiff may prevail in a trade dress infringement action only if it shows that an appreciable number of ordinarily prudent consumers of the type of product in question are likely to be confused as the source of the goods." Versa, 50 F.3d at 200 (emphasis added). This is because "[i]t is not unfair competition for someone to trade off the good will of a product, it is only unfair to deceive consumers as to the origin of one's goods and thereby trade off the good will of a prior producer." Id. at 207 (emphasis in original) (internal citations omitted).

The Third Circuit has directed district courts to employ the factors set forth in Interpace Corp. v. Lapp, Inc., 721 F.2d 460 (3d Cir. 1983), in determining whether there is likelihood of confusion. The Lapp factors include:

> (1) the degree of similarity between the plaintiff's trade dress and the allegedly infringing trade dress;
>
> (2) the strength of the plaintiff's trade dress;
>
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used its trade dress without evidence of actual confusion arising;

(5) the intent of the defendant in adopting its trade dress;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function;

(10) other facts suggesting that the consuming public might expect the plaintiff to manufacture a product in the defendant's market, or that the plaintiff is likely to expand into that market.

McNeil, 511 F.3d at 358 (citing Freedom Card, Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 471 (3d Cir. 2005)).

The Third Circuit has cautioned, however, that these factors are "qualitative" and that "not all factors will be relevant in all cases; further, the different factors may properly be accorded different weights depending on the particular factual setting." Id. That being said, "the single most important factor in determining likelihood of confusion is trade dress similarity." Id. at 359. "The proper test is not side-by-side comparison but whether the trade dresses create the same overall impression when viewed separately. However, if buyers typically see the two products side-by-side, as is true

in this case, then a side-by-side comparison may be appropriate." <u>Id.</u>

The Court addresses the factors relevant to the case at bar. The Court begins with the most important factor, the degree of similarity between Plaintiff's trade dress and Defendant's allegedly infringing trade dress. While both products are square pans, there are numerous obvious differences:

**<u>Copper Chef Pan</u>**



**<u>Gotham Steel Pan</u>**



Compl. ¶¶ 9-10.

As is readily apparent, the exteriors of the Copper Chef pan and the Gotham Steel pan are different colors. The exterior of the Copper Chef pan is copper, while the exterior of the

Gotham Steel pan is grey.  Additionally, the handles of the Gotham Steel pan are flat, whereas the handles of the Copper Chef pan are tubular.  Moreover, the bottoms of the two pans are different.  The bottom of the Copper Chef pan contains a plain circular disc at its center, surrounded by several small circles.  The Gotham Steel pan, on the other hand, has only several small diagonally-aligned circles, but it does not have a plain center circle.  Importantly, Defendant's product obviously identifies its brand name, Gotham Steel, on the handles of the Gotham Steel pan and on each side of the retail box, greatly diminishing any potential confusion as to the source of the product.  See Versa, 50 F.3d at 203 ("[C]larity of labeling in packaging and advertising will suffice to preclude almost all possibility of consumer confusion as to source stemming from the product's configuration.").

As to the retail packaging, the Court finds that the parties' packaging designs are starkly different:



Pl. Br. at 3.

The color schemes employed by the parties are distinct and readily distinguishable. Plaintiff's retail packaging uses primarily yellow and copper colors, while Defendant's packaging is largely red and black. Defendant's packaging also uses text and images that are different from Plaintiff's packaging. Finally, Defendant's packaging includes information in both English and French, unlike Plaintiff's packaging, which is exclusively in English.

The low degree of similarity suggests that consumer confusion is unlikely. Furthermore, the Court notes that there is no evidence in the record of actual confusion. Therefore, the factors addressing the length of time Defendant has used its trade dress without evidence of actual confusion arising and the evidence of actual confusion also militate against a finding of likelihood of consumer confusion.

The Court next considers the strength of Plaintiff's trade dress. "'[S]trength' of product configuration as relevant to determining likelihood of confusion on the part of ordinarily careful consumers should be found only if consumers rely on the product's configuration to identify the producer of the good." Versa, 50 F.3d at 203. As Defendant argues, "[t]here is no evidence in the record that consumers purchase Tristar's or Emson's square pans because their appearance identifies the source or whether the purchases are motivated by other factors,

such as pleasing design, price, or convenient availability at a frequently-visited store." Def. Opp. Br. at 12-13; see also Buzz Bee Toys, Inc. v. Swimways Corp., 20 F. Supp. 3d 483, 507 (D.N.J. 2014). At this juncture, Plaintiff has not established that the strength of its trade dress supports a finding of likelihood of confusion.

Next, the Court finds that the price of the goods suggests that consumers would take at least some care when making a purchase. "The greater the care and attention, the less the likelihood of confusion." Versa, 50 F.3d at 204. The parties' pans are sold for prices between approximately $40.00 and $75.00. The parties' pans are not inexpensive or disposable items. Additionally, as Plaintiff recognizes, consumers only need one square pan, See Mirchandani Supp. Decl. ¶ 13, suggesting that consumers would deliberate and consider their options before making such a purchase. The price of the pans and the importance of the items suggest that consumers would exercise some care and attention in their selection. See PB Brands, LLC v. Patel Shah Indian Grocery, 331 F. App'x 975, 982 (3d Cir. 2009) ("Inexpensive goods require consumers to exercise less care in their selection than expensive ones. The more important the use of the product, the more care that must be exercised in its selection."); Versa, 50 F.3d at 203 ("except where consumers ordinarily exercise virtually no care in

selecting a particular type of product (as may be the case with inexpensive disposable or consumable items, clarity of labeling in packaging and advertising will suffice to preclude almost all possibility of consumer confusion as to source stemming from the product's configuration."). This factor undercuts the likelihood of consumer confusion.

The Copper Chef pan and the Gotham Steel pan, however, are direct competitors in the same market. They are sold in similar stores, marketed to similar audiences via similar means, and serve similar functions. Thus, the factors addressing the similarity of the channels of trade, target consumers, similar functions, and other facts suggesting that the consuming public might expect the plaintiff to manufacture a product in the defendant's market, or that the plaintiff is likely to expand into that market suggest the possibility of consumer confusion.

The Court also considers Defendant's intent in adopting its trade dress. The Third Circuit has held that "a defendant's intent to confuse or deceive consumers as to the product's source may be highly probative of likelihood of confusion." Versa, 50 F.3d at 205. Plaintiff has presented no competent evidence that Defendant adopted its trade dress with the intent to infringe Plaintiff's trade dress or to confuse or deceive consumers as to the source of its pans. Rather, as the Court previously noted, Defendant clearly identified the source of its

product by conspicuously marking its product and its retail
packaging with "Gotham Steel".  This factor weighs against a
finding of likely confusion.

Having weighed the various Lapp factors and based upon the
evidentiary record presently before it, the Court finds that
consumer confusion between the Copper Chef pan and the Gotham
Steel pan is unlikely.  Thus, for this additional reason, the
Court finds that Plaintiff has not established a likelihood of
success on the merits of its trade dress claims.

### B. IRREPARABLE HARM

To establish irreparable harm, a plaintiff must allege an
injury that is "actual and imminent, not merely speculative."
Macchione v. Coordinator Adm'r in Washington, D.C., 591 F. App'x
48, 49 (3d Cir. 2014).  "[A] showing of irreparable harm is
insufficient if the harm will occur only in the indefinite
future.  Rather, the moving party must make a clear showing of
immediate irreparable harm."  Id. at 49-50 (quoting Campbell
Soup Co. v. ConAgra, Inc., 977 F.2d 96, 91 (3d Cir. 1992))
(emphasis in original).  "As the Supreme Court has pointed out,
a party seeking injunctive relief must make 'a clear showing'
that it is at risk of irreparable harm, which entails showing 'a
likelihood of substantial and immediate irreparable harm.'"
Apple, Inc. v. Samsung Elecs. Co., 678 F.3d 1314, 1324 (Fed.
Cir. 2012) (quoting Winter, 555 U.S. at 22; O'Shea v. Littleton,

414 U.S. 488, 502 (1974)) (affirming district court's denial of preliminary injunction based on plaintiff's failure to establish irreparable harm).  Moreover, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." In re Revel AC, Inc., 802 F.3d 558, 571 (3d Cir. 2015) (quoting Sampson v. Murray, 415 U.S. 61, 90 (1974)).

Plaintiff argues that it will suffer irreparable harm without a preliminary injunction in the form of "trespass on exclusive rights, competition leading to price erosion, tarnishing the market with poor quality product, loss of customer and retailer goodwill, and damage to Tristar's reputation as an innovator."  Pl. Br. at 11.  Yet Plaintiff has presented little more than attorney argument to support its claims of irreparable harm.[4]

While "[p]rice erosion, loss of good will, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm," Celsis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 930 (Fed. Cir. 2012) (citing Abbott, 544 F.3d at 1362; Sanofi-Synthelabo v. Apotex, Inc.,

_____

[4] As Defendant correctly noted, Plaintiff's counsel's arguments do not constitute competent evidence under the Federal Rules of Evidence.

470 F.3d 1368, 1382-83 (Fed Cir. 2006)), Plaintiff has presented no <u>evidence</u> to substantiate any likelihood of substantial and immediate irreparable harm.  For example, there is no competent evidence in the record that supports Plaintiff's claim that Defendant's product is of poor quality or that Plaintiff's reputation or goodwill has been tarnished.[5]  Additionally, Plaintiff expressed concerns that it would be shut out of certain retail outlets that did not want to carry two competing square pans.  See Mirchandani Supp. Decl. ¶ 11.  Yet, at the motion hearing, Plaintiff established that this concern did not materialize and that the retailer continued to carry both the Copper Chef square pan and the Gotham Steel square pan.

Moreover, as Plaintiff has not established a likelihood of success on the merits of its patent and trade dress infringement claims, Plaintiff has not established that it is likely to suffer irreparable harm in the form of trespass on its exclusive rights.  In any case, "[a] mere showing that [Plaintiff] might lose some insubstantial market share as a result of [Defendant's] infringement is not enough" to make a clear showing of likely irreparable harm.  Apple, 678 F.3d at 1324-25.

---

[5] Even assuming that Defendant's product is of inferior quality, as Plaintiff baldly asserts, it would seem to the Court that any difference in quality would justify the price difference between the parties' respective products and would likely result in dissatisfied Gotham Steel customers returning to Copper Chef.

Additionally, to establish a likelihood of irreparable harm in the context of patent infringement, a "patentee must also establish that the harm is sufficiently related to the infringement." Apple, Inc. v. Samsung Elecs. Co., 695 F.3d 1370, 1373 (Fed. Cir. 2012). In other words, Plaintiff must show a causal nexus between Defendant's alleged infringement and the alleged irreparable harm. Apple, 678 F.3d at 1324. Plaintiff has not even attempted to make such a showing.

Plaintiff's CEO avers in his Supplemental Declaration that "[e]very sale of Emson's Gotham Steel square pan is a lost sale for Tristar's Copper Chef, because retail consumers do not need (and do not have the kitchen space for) a second square pan." Mirchandani Supp. Decl. ¶ 13. He also states that Plaintiff "experienced a significant drop in sales from Amazon and a very rapid and substantial increase in its advertising costs" in March 2017. Id. ¶ 14. In his opening Declaration, Mirchandani also explained that, as a result of Defendant's decision to sell its product at $40.00 per pan, "Tristar has lowered its suggested list price to $59.99 [from $74.99] in an attempt to compete to avoid losing sales and market share." Mirchandani Decl. ¶ 13.

To the extent Mirchandani's statements may support a finding of price erosion, lost sales, customers, and/or revenue, Plaintiff has not demonstrated that these harms could not be

compensated with a monetary damages award.  During the preliminary injunction hearing, the Court conducted a colloquy with Plaintiff's counsel regarding the adequacy of monetary damages.  Counsel recognized that, although monetary damages could be difficult to calculate, in the event a preliminary injunction was improperly denied, Plaintiff may be entitled to recover both Defendant's profits and its own lost profits.

In light of the paucity of competent evidence in the record to support Plaintiff's claims of irreparable harm and the adequacy of monetary damages at a later date in the unlikely event Plaintiff prevails, the Court finds that Plaintiff has not made a clear showing that it is likely to suffer irreparable harm absent preliminary injunctive relief.

### C. BALANCE OF EQUITIES

As to the balance of equities, both parties submit that the equities tip in their favor as they will each be harmed if the preliminary injunction issues, in the case of Defendant, or if the preliminary injunction does not issue, in the case of Plaintiff.  One party may lose sales, customers, and/or revenue regardless of how this Court rules.  In light of this Court's rulings on the likelihood of success on the merits, the Court finds the equities and hardships to be in equipoise at this juncture.  The balance of equities factor neither weighs in favor nor against the issuance of a preliminary injunction.

**D. PUBLIC INTEREST**

"The public interest, of course, favors the maintenance of a well-functioning patent system.  But the 'public' also has a 'paramount interest in seeing that patent monopolies . . . are kept within their legitimate scope.'"  <u>Medtronic, Inc. v. Mirowski Family Ventures, LLC</u>, 134 S. Ct. 843, 851 (2014) (quoting <u>Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.</u>, 324 U.S. 806, 816 (1945)).  Accordingly, "[a]lthough the public interest inquiry is not necessarily or always bound to the likelihood of success on the merits, . . . absent any other relevant concerns, . . . the public is best served by enforcing patents that are likely valid and infringed."  <u>Abbott Labs. v. Andrx Pharm., Inc.</u>, 452 F.3d 1331, 1348 (Fed. Cir. 2006).  The public interest, however, is also benefited by "lower prices resulting from free market competition."  <u>Canon, Inc. v. GCC Int'l Ltd.</u>, 263 F. App'x 57, 62 (Fed. Cir. 2008).

Additionally, the Third Circuit has explained that "the most basic public interest at stake in all Lanham Act cases [is] the interest in prevention of confusion, particularly as it affects the public interest in truth and accuracy."  <u>Kos Pharm.</u>, 369 F.3d at 730.  In the trade dress context, however, there is also a public interest in enhancing competition in the market.  <u>See</u> <u>Keene Corp. v. Paraflex Indus., Inc.</u>, 653 F.2d 822, 827

(3d Cir. 1981); see also Wal-Mart, 529 U.S. at 213 ("[c]onsumers should not be deprived of the benefits of competition . . . by a rule of law that facilitates plausible threats of suit against new entrants based upon alleged inherent distinctiveness.").

As Plaintiff has not made a clear showing of likelihood of success on the merits of its patent infringement claims, the public interest in enforcing valid and infringed patents would not be served by a preliminary injunction. Likewise, as Plaintiff has not established a likelihood of success on the merits of its trade dress infringement claims and, importantly, has not established a likelihood of consumer confusion, the public interest in preventing confusion and deception is not furthered by a preliminary injunction. Indeed, the denial of a preliminary injunction would better serve the public interest by promoting free competition in the market of deep square pots. Accordingly, the Court finds that the public interest does not weigh in favor of the issuance of a preliminary injunction.

## III.  CONCLUSION

For the reasons set forth above, Plaintiff's Motion for a Preliminary Injunction is DENIED. An appropriate Order shall issue on this date.

s/Renée Marie Bumb
RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE

Dated: April 19, 2017